[Civ. No. 255.  Third Appellate District.—May 16, 1907.]

## U. G. PETERSON et al., Respondents, v. ADRIEN CHAIX et al., Appellants.

CONTRACT FOR SALE OF GRAPES —"ABOUT 250 TONS MORE OR LESS"— PAROL EVIDENCE—ENTIRE CROP.—Under a written contract for the sale of "about 250 tons grapes more or less, at the stipulated price of $27.00 per ton cash after delivery, grapes to be of sound quality," parol or extrinsic evidence is not admissible to show that the sale was intended to include the entire crop of grapes grown in the vineyards of the sellers, including 166 tons additional to the quantity specified.

ID.—IMPLIED AGREEMENT.—Though there is no express agreement to purchase the grapes, the law implies an agreement by the purchasers to pay at the stipulated price for all grapes received by them of the quality named, and when nearly 257 tons were accepted, the law implies no agreement to accept any grapes in excess thereof.

ID.—GENERAL RULE AS TO EXTRINSIC EVIDENCE—EXCEPTIONS.—Though, as a general rule, where a contract appears to be partly in writing and partly in parol, and is uncertain in its terms, parol evidence is admissible to show what the stipulations were, and in construing an uncertain contract parol evidence is admissible to show the circumstances under which the contract was made, etc., yet neither

of these rules applies where the contract, with what the law implies from its terms as a necessary part thereof, is certain, clear, definite, complete and unambiguous, in which case it cannot be added to, varied or contradicted by extrinsic evidence.

ID.—CONSTRUCTION OF CODE PROVISIONS.—Section 1860 of the Civil Code, as to parol evidence of the circumstances, etc., is to be restricted in its application, so as to harmonize with section 1625 of that code, making a written contract supersede all oral negotiations, and also with section 1856 of the Code of Civil Procedure, allowing a mistake, imperfection, or invalidity of the contract to be put in issue by the pleadings.

ID.—TERMS OF CONTRACT NOT INTRODUCING AMBIGUITY—"ABOUT"—"MORE OR LESS."—It is settled, upon authority, that the terms "about" and "more or less," used in the contract in question, introduce no ambiguity, and that extrinsic evidence of previous or contemporaneous conversations is not admissible to show what was meant by their use when the contract does not refer to independent circumstances to identify the goods sold.

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial. Emmett Seawell, Judge.

The facts are stated in the opinion of the court.

E. B. Young, and J. W. Oates, for Appellants.

J. R. Leppo, for Respondents.

CHIPMAN, P. J.—In their petition for rehearing plaintiffs urged that the written memorandum did not constitute the whole of the agreement between the parties; but that there were conditions, resting in parol, which were an essential part thereof, and that the case presents an instance "where a verbal contract is entire, and a part only in part performance is reduced to writing," and hence parol testimony was admissible to establish the complete agreement. We do not think that an extended discussion is called for in disposing of plaintiffs' contention. It may be conceded, and as we understand defendants' position they admit, that where the contract appears to be merely an incomplete memorandum, or to be partly in writing and partly in parol, extrinsic evidence is admissible to show what the mutual stipulations were. But this is true only as to such matters concerning which the

written memorandum is silent or as to which terms are used which import ambiguity or uncertainty—i. e., which on their face admit of doubt as to what the parties meant by their use. There is another principle to be observed, namely, that whatever the law implies from a contract in writing is as much a part of the contract as that which is therein expressed; and to the extent that the contract, with that which the law implies, is clear, definite and complete, it cannot be added to, varied or contradicted by extrinsic evidence. A still further principle is not to be overlooked, namely, extrinsic evidence is not admissible to show that a contract was partly written and partly oral, if the matter proposed to be made part of the contract by such evidence is inconsistent with the terms of the writing. We may add a still further and salutary rule, which has been recently given careful and extended discussion by this court, in the case of *Hale Bros. Inc.* v. *Milliken, ante,* p. 344, [90 Pac. 365], and it is this: While it is competent in construing a contract to show the situation of the parties, the subject matter of the contract, and acts of the parties under the contract, as tending to show how they understood it, still this cannot be done to the extent of varying or contradicting a written contract, where such contract is certain, complete and unambiguous. The foregoing principles are stated to be the law in the very well reasoned case, supported by cited authorities, of *Faulkner* v. *Smith Wallpaper Co.,* 88 Iowa, 169, [45 Am. St. Rep. 230, 55 N. W. 200]. In that case the memorandum read as follows: "On demand I promise to deliver to the order of E. F. Fisher Eight hundred dollars (less twenty per cent discount), in wall paper, at wholesale prices, good, clean, assorted stock out of my store on Fifth Street, Des Moines, Iowa. No storage. Lew Smith Wall Paper Co." The defendant pleaded that, at the date of making the order, and of its acceptance by Fisher, the wholesale price for good, clean, assorted wallpaper, and the price upon which said order was based, and at which said paper was to be delivered by the defendant to, and accepted by, the payee was agreed upon, and set forth on a card then shown Fisher; that the schedule of prices printed upon the card was then agreed upon between the parties to said order as the then wholesale prices at which paper was to be delivered, and said card accompanied the order, as a part of it, and a part of the

contract fixing the wholesale price of said paper. Defendant was permitted to prove at the trial that, when the contract was made between the parties, he handed the plaintiff's assignor a card, having printed thereon a price list of wallpaper, and that he was to take the paper mentioned in the contract at the prices stated on the card. It was not attached to or made part of the written contract or referred to in it. The evidence was objected to, as tending to vary and contradict the written contract of the parties. Defendant claimed that the evidence was admissible as constituting part of the contract; that, though it was on a separate piece of paper, still it was in fact but a part of and altogether constituted but one contract. The Iowa supreme court held that the lower court erred in admitting the evidence. In speaking of the terms "wholesale price," the court said: "There is no claim that the schedule of prices, as set forth on the card introduced in evidence, was to be a part of the written contract, and was omitted by accident, mistake, oversight or fraud. No such issue is presented. The evidence objected to would work a material change in the terms of the contract. It shows that the paper was to be received at a price which was agreed upon when the contract was executed, and outside of the provisions of the written contract. It measured the amount of paper that should be received under the written contract by the then wholesale market price, when the written contract measured the amount of paper to be delivered under it by the wholesale price at the time of demand made for the goods."

In the case here the sole controversy relates to the quantity of grapes which defendants agreed to receive. It is true the contract is silent as to the agreement of defendants to receive any of the grapes. But they did receive them and no question arises as to this. The law would have implied an agreement to pay at the stipulated price for all grapes received by them of the quality named. True, also, that the contract is silent as to the varieties of the grapes, but as all bore the same price and as no dispute arose upon this point the fact is immaterial. So, also, as to the omission to state when the delivery was to be made or whence the grapes were to come. Reduced to the actual matter in controversy, the sole dispute was whether plaintiffs could prove by parol testimony that

defendants had agreed to receive all of plaintiffs' crop, or to receive 166 tons of grapes in excess of the "250 tons more or less," specified in the written memorandum. It is not necessary to repeat the observations upon this point heretofore made. We are still of the opinion that extrinsic evidence was not admissible to materially add to the quantity mentioned in the memorandum. The principle invoked by respondents, when rightly applied, affords them no relief.

For the reasons stated in our former opinion and herein, the judgment and order are reversed.

Hart, J., and Burnett, J., concurred.

The following is the former opinion above referred to, rendered February 20, 1907:

CHIPMAN, P. J.—Action upon a contract for the sale of certain grapes. The cause was tried by the court without a jury and plaintiffs had judgment, from which and from the order denying their motion for a new trial defendants appeal.

It is averred in the complaint that on September 22, 1902, plaintiffs entered into a contract with defendants whereby plaintiffs agreed to sell and deliver to defendants at their winery in Santa Rosa, and defendants agreed to buy and receive, the crop of grapes owned and grown by plaintiffs on their vineyards near said city, for the season of 1902, said grapes to be of sound quality but not required to contain any specified percentage of sugar, and that defendants agreed to pay to plaintiffs for the same, cash on delivery, the sum of $27 per ton; that prior to October 27, 1902, plaintiffs delivered to defendants, under said contract, 256.817-1000 tons of said grapes and defendants then and there duly received and accepted the same under said contract, amounting to $6,934.05; that plaintiffs were ready and willing to deliver the balance of their said crop to defendants, but defendants gave plaintiffs notice that they, defendants, "would not receive or accept or pay for any more of the said crop and then and there refused to receive or accept any more of said grapes"; that there remained undelivered of said crop 166.155-1000 tons of grapes of quality called for by said contract; that after defendants' said refusal, to wit,

on October 28, 1902, plaintiffs sold to the best advantage said remaining grapes (except ten tons hereinafter mentioned), receiving therefor the sum of $20 per ton, amounting in the aggregate to $3,123.10, and that the difference between said sum and the sum agreed by defendants to be paid is $1,093.08; that there remained undelivered to defendants ten tons of grapes which by reason of defendants' said refusal became decayed and valueless.

Defendants by their answer admitted the delivery to them, agreeably to the contract, of 239.291-1000 tons, but alleged that 17.495-1000 tons delivered to defendants prior to August 27, 1902, were of inferior quality, for which defendants agreed to pay the reasonable market value, which they allege was and is $317.43, and admit an indebtedness of $6,778.30, which sum they allege they tendered to plaintiffs prior to the commencement of this action, and that plaintiffs refused to receive the same, and they aver a present willingness to pay said sum to plaintiffs; defendants deny specifically the allegations of the complaint except as to the above admissions.

The court made findings in accordance with the facts set forth in the complaint and found that "no contract or agreement other than the one above mentioned (i. e., alleged in the complaint) was ever made between plaintiffs and defendants for the sale and purchase of plaintiffs' said crop of grapes for the season of 1902." The court also found that no tender had been made by defendants, as to which finding the matter may be dismissed, as it is not now claimed that any tender was made by defendants.

It appeared by the opening statement of counsel for plaintiffs and during the examination of the first witness called by plaintiffs that a written contract was entered into by the parties, defendants acting through one Hood, admittedly their agent, plaintiffs, however, claiming that it was but a part of the contract. This instrument bears date as alleged of the contract pleaded in the complaint, and is as follows:

"Santa Rosa, Sept. 22nd, 1902.

"In consideration of one ($1.00) dollar, paid to me in hand, I sell and promise to deliver to CHAIX & BERNARD at James G. Hood's winery at Santa Rosa, Cal., about 250 tons grapes more or less tons of grapes, at the stipulated price of $27.00 per ton cash after delivery.

"Grapes to be of sound quality, ~~and not less than (22) Twenty-Two per cent of sugar.~~

"Seller, — PETERSON BROS.
"Buyer, — JAMES G. HOOD."

The last clause shown in the contract as erased was so erased before signing.

Over the objection of defendants, the plaintiffs were permitted to introduce the testimony of several witnesses as to the circumstances leading up to the signing of the above memorandum; to show that the sale was intended to include the entire crop of plaintiffs grown upon their vineyards; explaining the varieties of grapes and estimated tons of each; that the grapes were not to be subject to the sugar test; in short, witnesses were permitted to testify to all the conversations and details relating to the transaction that took place during the negotiations and contemporaneously with the signing of the contract. Upon objections being interposed and after argument, the court remarked: "My understanding is that all these matters of the conversation precedent are merged in a written contract, but under section 1860 of the Code of Civil Procedure I will permit the question and you can take your exception." The objections and ruling ran to all this line of testimony, of which there was much, and present the principal question before us. Respondents' view of the matter as stated in the brief is that "the writing of September 22d is only a commercial memorandum, and does not purport to fully set forth all of the contract of sale and purchase of the grapes," and hence all the circumstances attending the making of the contract may be inquired into.

Section 1860, Code of Civil Procedure, upon which reliance is placed, reads as follows: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret." This section is not to be read as applicable to every contract that may come before the court for interpretation. It has its limitations and must be read in connection with other provisions of our code. To give it a literal and universal application would bring it into direct conflict with section 1856, Code of Civil Procedure, which provides: "When the terms of an agreement have been reduced to writing by

the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases: 1. Where a mistake or imperfection of the writing is put in issue by the pleadings; 2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in section eighteen hundred and sixty, or to explain an extrinsic ambiguity, or to establish illegality or fraud.'' In the present case there is no allegation or proof of mistake, of invalidity of the contract, or of fraud.

Section 1625, Civil Code, must also be read and harmonized with section 1860, Code of Civil Procedure. It reads: ''The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.'' From these and other sections which might be cited, it is plain that section 1860 is to be restricted in its application.

The court said in *Balfour* v. *Fresno C. & I. Co.*, 109 Cal. 221, 225, [41 Pac. 876, 877] : ''If the language of the contract be, as defendant contends, plain and unambiguous, and susceptible of but one construction, then the objection was good, and the evidence properly excluded. If, however, the language employed be fairly susceptible of either one of the two interpretations contended for without doing violence to its usual and ordinary import, or some established rule of construction, then an ambiguity arises, which extrinsic evidence may be resorted to for the purpose of explaining. This is not allowing parol evidence for the purpose of varying or altering the contract, or of putting a different sense and construction upon its language from that which it would naturally bear, but for the purpose of showing the circumstances under which the language was used, and applying it according to the intention of the parties.'' (Citing Code Civ. Proc., sec. 1860, and cases.)

In *Johnson* v. *Pugh*, 110 Wis. 167, [85 N. W. 641], it was broadly contended that testimony of the circumstances surrounding and leading up to the making of a written contract is always admissible, not for the purpose of changing or vary-

ing the terms of the written instrument, but for the purpose of putting the court in possession of the circumstances of the parties at the time of the making of the contract. "Not so," said the court. "Where there is no ambiguity in the contract, either in its literal sense or when it is applied to the subject thereof, it must speak for itself entirely unaided by extrinsic matters. Where such ambiguity does exist, then evidence of the circumstances under which the contract was made is proper to enable the court in the light thereof to read the instrument in the sense the parties intended, if that can be done without violence to the rules of law."

The meaning of section 1860 may be discovered in the light of the foregoing decisions. Before resort can be had to extrinsic evidence the language employed in the contract must not only be "fairly susceptible of either one of the two interpretations contended for," but this must be "without doing violence to its usual and ordinary import," and it must also be "without doing violence to . . . some established rule of construction." (*Balfour* v. *Fresno L. & I. Co., supra.*) It is no part of the office of construction to add to the contract or take from it, but it is to ascertain what the parties intended by what they have said. If there be no ambiguity in the contract, it must speak for itself. It is true, as provided in section 1861, Code of Civil Procedure, that although "the terms of a writing are presumed to have been used in their primary and general acceptation," still evidence is admissible to show "that they have a local, technical or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly." Such was the case of *Higgins* v. *Cal. Petroleum etc. Co.,* 120 Cal. 631, [52 Pac. 1080], cited by respondents, where the terms used were "short tons." It was there held that it is not necessary that the contract should expressly indicate a local, technical, or peculiar signification, but "that it may be shown by evidence that the language is used in a technical, local or peculiar sense, and not merely that evidence may be introduced to show what such meaning is, when language is so used." That case, however, was not intended to change the rules above mentioned. The rules stated in sections 1860 and 1861 do not apply where the terms used in the contract are free from ambiguity or are not used in a technical, local or peculiar signification. The code rule enunciated in section 1856, Code of Civil Procedure, has been frequently enforced by our supreme court, and was

the rule before being incorporated into the code. (*Goldman v. Davis,* 23 Cal. 256. See of later cases: *Schurtz* v. *Romer,* 82 Cal. 474, [23 Pac. 118] ; *West Coast L. Co.* v. *Apfield,* 86 Cal. 335, [24 Pac. 993] ; *Beall* v. *Fisher,* 95 Cal. 568, [30 Pac. 773] ; and also *McDonald* v. *Poole,* 113 Cal. 437, [45 Pac. 702], construing sec. 1625, Civ. Code.) Among cases in other jurisdictions the following may be consulted with profit; they come down finally to the simple proposition that where there is no uncertainty of sense there is no room for construction: *Hart* v. *Hart,* 117 Wis. 639, [94 N. W. 890] ; *Fawkner* v. *Smith W. P. Co.,* 88 Iowa, 169, [45 Am. St. Rep. 230, 55 N. W. 200]. If it be claimed that the contract is incomplete, it must so appear upon inspection before parol evidence is admissible to complete it, and such evidence must be consistent with and not contradictory of it. (*Brantingham* v. *Huff,* 174 N. Y. 53, [95 Am. St. Rep. 545, 66 N. E. 620] ; *Ferguson C. Co.* v. *Manhattan T. Co.,* 118 Fed. 791.)

In the case here the only terms which have given rise to any controversy are the terms "about" and "more or less" as applied to the quantity of grapes sold. The sugar test was stricken out, and it so appears upon the face of the contract. There is no uncertainty that the plaintiffs agreed to sell and deliver 250 tons of grapes at a place named and that the buyer was to pay $27 per ton upon delivery, the grapes to be of sound quality. The material question which has arisen between the parties as to the meaning of the contract is the single question of quantity agreed to be sold and delivered. Parol evidence was not admitted to show that the terms "about" and "more or less" had a local or technical or otherwise peculiar signification and were so understood in the particular instance, but the evidence was introduced to prove that it was part of the agreement that the buyer should receive all the grapes grown by the seller on the several vineyards mentioned by the witnesses; that when the matter of quantity in the vineyards was under discussion, and the estimate of plaintiffs was from 250 to 290 tons, defendants said it would make no difference as to the amount, for they would take all the grapes that plaintiffs had. Plaintiffs made an unsuccessful effort to show by parol that the terms "more or less" had by custom among buyers and sellers of wine grapes a local and peculiar signification which meant all grapes grown by the seller. Defendants objected to the

testimony, however, and the objection was sustained. It seems to us that the conversations occurring when the parties were estimating the quantity thought. to be on the vines, should be regarded in the light of opinions which were to form some safe quantity to name in the contract which plaintiffs were willing to agree to sell and deliver and not as part of the contract itself. So important a matter as that the buyers agreed to take all the grapes grown by the sellers, regardless of quantity, should have found expression in the contract, either directly or by introducing some extrinsic ambiguity, and not having been so expressed, cannot now be added thereto by parol. This additional quantity is 166 tons, or sixty per cent greater than the quantity stated in the contract by the sellers. Possibly had this large excess been suggested during these conversations the buyers would have hesitated to say that it made no difference as to the quantity. However this may be, the terms "about" and "more or less" have frequently found their way into contracts and courts have without disagreement held that they introduce no ambiguity and that extrinsic evidence of previous or contemporaneous conversations is not admissible to show what the parties meant by their use, unless the contract on its face makes reference to some independent circumstances to identify the goods sold.

Both parties cite *Brawley* v. *United States,* 96 U. S. 168. This is a leading case and has been often cited. It lays down certain rules for the guidance of courts in the construction of similar contracts. In that case the contract was to deliver at a certain army post "880 cords of sound, first quality, of merchantable wood, more or less, as shall be determined to be necessary, by the post-commander, for the regular supply," etc. It appeared that the quarter-master's department had made an estimate of the quantity required and had accordingly advertised for 880 cords; the bids were opened April 15, 1871, and the contract was awarded May 6th, but though dated on that day was not executed until June 14th. About June 18th the post-commander notified plaintiff, the claimant, that but 40 cords of wood would be required and forbade his hauling any more to the government yard. He had, however, at great expense, before the contract was signed, gone forward and cut the full quantity and hauled it near to the yard. The court held that "the substantial en-

gagement was to furnish what should be determined to be necessary by the post-commander for the regular supply for the year,'' and plaintiff failed in his action. The opinion is valuable for its concise and accurate statement of the rules governing similar contracts. Said the court, by Mr. Justice Bradley:

''Where a contract is made to sell or furnish certain goods identified by independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about,' or 'more or less,' or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but cnly as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it. In such cases, the governing rule is somewhat analogous to that which is applied in the description of lands, where natural boundaries and monuments control courses and distances and estimates of quantity.

''But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure or weight.

''If, however, the qualifying words are supplemented by other stipulations or conditions which give them a broader scope or a more extensive significancy, then the contract is to be governed by such added stipulations or conditions. As, if it be agreed to furnish so many bushels of wheat, more or less, according to what the party receiving it shall require for the use of his mill, then the contract is not governed by the quantity named, nor by that quantity with slight and unimportant variations, but what the receiving party shall require for the use of his mill; and the variation from the quantity named will depend upon his discretion and requirements, so long as he acts in good faith. So where a manufacturer contracts to deliver at a certain price all the articles

he shall make in his factory for the space of two years, 'say a thousand to twelve hundred gallons of naphtha per month,' the designation of quantity is qualified not only by the indeterminate word 'say,' but by the fair discretion or ability of the manufacturer, always provided he acts in good faith. . . .

"Reference is made to the previous negotiations which led to the making of the contract, the bid of the claimant, the fact that the contract was awarded to him on his bid as early as May, and that, on the faith and expectation that the quantity named would be wanted, he had cut the eight hundred and eighty cords of wood before the contract was signed.

"All this is irrelevant matter. The written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant's folly to have signed it. The court cannot be governed by any such outside considerations. Previous and contemporary transactions and facts may be very properly taken into consideration to ascertain the subject matter of a contract and the sense in which the parties may have used particular terms, but not to alter or modify the plain language which they have used."

The importance of the question and the earnest contention of respondent that the lower court ruled correctly is our justification for a still further notice of some of the many cases in which the matter has been considered. In *Shickle* v. *Choteau H. & V. Iron Co.*, 84 Mo. 161, the opinion, as rendered in the court of appeals, 10 Mo. App. 242, was adopted. The contract read:

"Your proposal of four hundred tons, more or less, of wrought scrap, consisting of one, one-half and three-eighth plate blacksmith scrap, and lot of gas pipes from Southern Hotel, and other scrap, as shown your Mr. Fusz, at twenty-two dollars per net ton in our yard, is accepted. You can commence hauling same at your convenience,"

The court said: "Defendant admitted the purchase and receipt of the iron at the price mentioned and nonpayment of the balance claimed; but by way of counterclaim alleged that said iron was delivered in part performance of the contract above under which they claimed that it was agreed that defendants were to have all the scrap iron in plaintiff's yard.

''Evidence was offered to show that at the time the terms were agreed upon the parties were in the yard containing the scrap and made estimates of the quantity, and defendants offered to prove that it was then agreed that they were to have all the scrap iron.'' The court held this evidence inadmissible. As reported in 10 Mo. App., the court said:

''The words 'more or less' in a written contract are never understood to permit more than a small departure from the quantity named in the contract. Such being the meaning affixed by law to the words 'more or less' in a written contract, the use of such words does not create such an ambiguity in the contract as will let in parol explanation. The words '400 tons more or less' are to be taken, not as mere words of expectation, but as words of contract limiting and defining the quantity to be sold. (*Morris* v. *Levison,* 1 C. P. Div. 155; *Leeming* v. *Snaith,* 16 Q. B. 275.) The construction put upon the contract by the defendant has the effect of erasing from the contract the words '400 tons.' This cannot be done. It is well settled, in interpreting any written instrument, that such a meaning shall be put upon it as will, if possible, give effect to all its parts.''

In *Cabot* v. *Winsor,* 1 Allen (83 Mass.), 546, the contract was as follows: ''Sold to Nath'l Winsor Jr. & Co. for account of Stephen Cabot, Esq., five hundred (500) bundles, more or less, gunny bags at 10c. per bag.'' It appeared in evidence that both parties knew that the object of the defendant in making the purchase was to fill the ship ''Hesperus,'' then lying at India Wharf, and that at the time of the purchase it was uncertain what number of bundles would be needed for that purpose. Only 200 bundles were actually taken on board of the ''Hesperus,'' that being all that proved to be necessary to fill the ship; the remainder, about 275 bundles, were left on the wharf. Defendants claimed that under the contract they were to have 500 bundles, or more or less than that number, as might reasonably be found necessary to fill the ship, or at their election; and that, as they did not require any more than the 200 bundles for that purpose, and as they in fact never received any more than that number, they were only bound to pay for 200.

But it was held at the trial that there was no latent ambiguity in the contract, and that its construction was for the court. Defendants offered to prove by parol that both par-

ties understood the contract differently, and that it was not intended to cover more than enough to fill the ship; and they offered to prove the declarations and acts of the plaintiff before, at the time of, and after the making of the contract, for the purpose of showing that he so construed it; but the judge excluded the evidence. On the appeal the supreme judicial court said:

"We are unable to perceive any ground on which it can be held that this contract falls within any of the exceptions to the familiar and well-established rule which excludes all parol evidence in the construction of the written agreements of parties. The language in which it is expressed is not technical, nor is it alleged to have any peculiar or local signification, or to have been used with reference to any custom or usage, which would vary or change its natural and ordinary meaning. Nor are the terms of the contract rendered uncertain or doubtful by reference to extrinsic facts, so as to create a latent ambiguity. The words 'more or less,' which seem to have given rise to the contention between the parties, have a plain, ordinary and popular signification, and are often used in contracts relating both to real and personal estate."

After speaking of the sales of merchandise, especially in large quantities, where these terms are frequently used in connection with the specific quantity named in the contract, the court said: "But in such cases, parol evidence is not admitted to show that the parties intended to buy and sell a different quantity or amount from that stated in the written agreement. On the contrary, it is held to be a contract for the sale of the quantity or amount specified; and the effect of the words 'more or less' is only to permit the vendor to fulfill his contract by a delivery of so much as may reasonably and fairly be held to be a compliance with the contract, after making due allowance for an excess or short delivery arising from the usual and ordinary causes, which prevent an accurate estimate of the weight or number of the articles sold." It was held that the readiness to deliver 475 bundles was sufficient compliance, and that "a variation of five per cent in so large a quantity was not such a deficiency as to fall outside of the fair and reasonable limit of short delivery."

In *Creighton* v. *Comstock*, 27 Ohio St. 548, the sale was of timber "supposed to be twenty-three thousand feet white pine timber, more or less, now laying in the river immediately under said Creighton's logway in the Ohio River at Columbus." A delivery of 16,000 feet was held to be insufficient and involved too great a variation or deficiency to be brought within the meaning of the term "more or less."

In *Holland* v. *Rea*, 48 Mich. 218, [12 N. W. 167], the court held that 473 M feet of lumber would not satisfy a call for 500 M feet "more or less." See, also, the rule stated in *Kirwan* v. *Van Camp Packing Co.*, 12 Ind. App. 1, [39 N. E. 536].

Respondent cites the case of *Day* v. *Cross*, 59 Tex. 595. In that case the sale was of all the cattle of certain brands, 10,000 head, more or less, except a certain number of the cattle of certain brands. The court held that it was not a guaranty as to the number of the cattle in said marks and brands, but a contract for the sale of the marks and brands, and that the seller was only bound to exercise good faith, care, skill and energy to collect the cattle, taking them from the range where they were accustomed to run at the making of the contract. Here the controlling feature was the marks and brands and not the designated number as indicating what was sold.

In *Tilden* v. *Rosenthal*, 41 Ill. 385, 89 Am. Dec. 388, by the written contract defendant agreed to deliver on a certain day "262 head, more or less, of good fat cattle . . . to average thirteen hundred pounds, and are the cattle known as the McCoy and Bishop lot, now being fed in the vicinity of Council Bluffs, Iowa." Plaintiffs tendered 178 head, which defendants refused to receive and plaintiffs brought suit for this number. The court held that the phrase "more or less" was used by the parties to cover such trifling deficiencies in number as might be caused by the ordinary casualties of death or loss. "But," said the court, "the deficiency was nearly one-third of the whole number contracted for. We are not prepared to say that when a person contracts for a lot of cattle containing 262 head he shall accept 178." See cases collected in Benjamin on Sales, section 682 et seq. For discussion of rule in sale of land see *Belknap* v. *Sealey*, 14 N. Y. (4 Kern.) 143, 67 Am. Dec. 120, and note; *Harrell* v. *Hill*, 19 Ark. 102, 68 Am. Dec. 202.

Appellants make no point in their brief as to the 17 tons for which they allege that they agreed to pay the market value. The sole question discussed relates to the liability of defendants for the 166 tons of grapes which they refused to accept.

Our conclusion is that in accepting the 256.817 tons defendants became liable therefor at the contract price, but that they were not bound to accept the excess tendered by plaintiffs and refused by defendants.

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.